**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FRED ISON, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 10 C 0711** |
| | ) | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Fred Ison, Jr. ("Ison" or "claimant"), has brought a motion for summary judgment [21] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. § 1382c(a)(3)(A). The Commissioner filed a response [26] asking the Court to uphold the decision of the Administrative Law Judge. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 1383(c). For the reasons set forth below, claimant's motion for summary judgment is granted.

**I.     BACKGROUND**

**A.     Procedural History**

Ison filed an application for SSI on December 19, 2007, alleging an onset date of October 2, 2003 due to Bipolar disorder, Hepatitis C, and a left leg injury. (R. 49.) His claim was denied initially on March 21, 2008, and again on June 3, 2008 after a timely request for reconsideration. (R. 49-53, 67-71.) Thereafter, Ison requested a hearing,

which took place on October 21, 2008 before Administrative Law Judge Linda Halperin

("ALJ Halperin" or "ALJ"). (R. 7-34.) On March 17, 2009, ALJ Halperin issued a written

decision denying Ison's request for benefits. (R. 37-48.) Ison filed a timely request for

review (R. 6), which the Appeals Council denied on December 4, 2009. (R. 1-3.) The

ALJ's decision then became the final decision of the Commissioner. *Zurawski v. Halter*,

245 F.3d 881, 883 (7th Cir. 2001). This action followed.

### B. Medical Evidence

#### 1. Community Counseling Centers of Chicago

Records reveal that in late 2007 Ison sought treatment at Community Counseling

Centers of Chicago ("C4"), an outpatient recovery program, for his "drug abuse" and

"bipolar condition." (R. 244.) It appears that Ison was first evaluated at C4 by a Dr.

Wilson on December 18, 2007, eight months after he was released from prison. (R.

244-247.) At that time, Ison complained of difficulty sleeping, foot pain from fallen

arches, as well as muscle pain in his lower legs. (R. 245.) He stated that he was

diagnosed with Hepatitis C in 2003, but had not had any treatment. (*Id.*) The

evaluation also indicated that he had seen a psychiatrist while in prison and that he was

admitted to Read Mental Health Center's psychiatric unit in 1984. (R. 244.)

Ison reported mood swings, racing thoughts, and irritability. (R. 243.) He

described periods of high energy with rapid speech, followed by low periods that last a

few days. (*Id.*) Ison explained that he could not read for very long and that he had to

write things down because he cannot remember anything. (R. 246.) Ison told Dr.

Wilson that he uses marijuana and crack, and drinks heavy amounts of alcohol. (R.

243.)  He denied suicidal thoughts, but reported recent homicidal thoughts.  (*Id.*)

Dr.  Wilson's exam revealed poor attention and memory, depressed mood, irritability and restricted affect.  (R. 246.)  At the time, Ison's Global Assessment of Functioning ("GAF") was 58.[1]  (R. 247.)  Dr. Wilson assessed Bipolar disorder and polysubstance dependence.  (*Id.*)  He prescribed Seroquel and Lithium.  (*Id.*)  Ison was also advised to participate in group therapy sessions twelve hours a week and in individual therapy one hour a week.  (R. 194.)

During a follow-up appointment on January 4, 2008, Ison reported that he was doing better.  (R. 248.)  Ison stated that he had not used drugs for the last 12 days.  (*Id.*)  His mood and affect were documented as "vague."  (*Id.*)  On January 28, 2008, Ison claimed that he had been sober for 35 days.  (R. 249.)  He was not taking the Seroquel and was inadvertently taking only half of the prescribed dose of Lithium.  (*Id.*)  His mood was "ok," but Dr. Wilson noted that he was irritable.  (*Id.*)

By April 7, 2008, claimant told Dr. Wilson that he was unhappy with his medication, explaining that the Lithium made it hard to get up in the morning and gives him carbohydrate cravings.  (R. 250.)  Ison admitted that the Lithium helped his mood somewhat, but not enough to put up with the side effects.  (*Id.*)  Ison also complained of

---

[1] The GAF is a scale of zero through 100 used by medical health professionals to rate social, occupational, and psychological functioning of adults.  *White v. Astrue*, --- F.Supp.2d ----, 2011 WL 5039802, at * 4, n.2 (N.D. Ill. 2011) (citing Diagnostic & Statistical Manual of Mental Disorders Text Revision 34 (4th ed. 2000)).  "A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Longerman v. Astrue*, No. 11 C 383, 2011 WL 5190319, at *3 n.7 (N.D. Ill. Oct. 28, 2011) (citation omitted).

mood swings, racing thoughts, and poor concentration. (*Id.*) Ison reported that he was still sober. (*Id.*) Dr. Wilson granted Ison's request to go off the prescribed medication, noting that he may no longer need medication if he could maintain his sobriety. (*Id.*)

On May 28, 2008, after being off medication since his last visit, Ison denied sustained depression, suicidal or homicidal thoughts, or psychotic symptoms. (R. 251.) However, he reported mild racing thoughts, and his affect was noted as mildly irritable. (*Id.*) Ison was cooperative, but somewhat antagonistic. (*Id.*) Although hesitant, Ison agreed to try Abilify as long as there were no side effects. (*Id.*)

By July 9, 2008, Ison had returned to using alcohol, cocaine, and marijuana, and had ceased taking Abilify a few days after the May 28 appointment because it "wasn't doing anything." (R. 252.) While he initially agreed to undergo inpatient treatment, he became hostile and belligerent when Dr. Wilson raised the subject of medication. (*Id.*) Ison was described as uncooperative, antagonistic, nervous, hyper, and anxious. (*Id.*)

On September 17, 2008, Ison told Dr. Wilson that he had checked himself into Chicago Read Mental Health Center about a month prior.[2] (R. 253.) Ison also told Dr. Wilson that he had restarted taking Lithium (although less than prescribed due to side effects) and had sustained sobriety. (*Id.*) He reported that the Lithium was helping keep his mood stable, and his mood was described as "pretty good." (*Id.*) This was the best Dr. Wilson had ever seen him. (*Id.*) But, on September 29, 2008, Ison confessed to Dr. Wilson that he had actually been high on marijuana during his last appointment. (R. 254.) Ison reported he was having a hard time maintaining hope that sobriety would

---

[2] Records from Chicago Read are for the most part illegible. (R. 258-261.) However, it does appear that Ison was discharged from Read sometime after September 8, 2008. (R. 260.)

lead to any positive changes in his life.  (*Id.*)  His frustration, combined with lack of

structure, "leads to using."  (*Id.*)  As a result, he described his mood as "pissed off."

(*Id.*)  Dr. Wilson acknowledged that Ison was not doing well, but noted that this

appeared to be a result of drug use rather than psychological symptoms.  (*Id.*)

### 2.    Other Treatment

On February 8, 2008, Ison underwent an evaluation with Dr. Charles Yingling,

who completed a "Medical Evaluation" for the State of Illinois Department of Human

Services.  (R. 205-208.)  Dr. Yingling's report indicated that Ison had the full capacity to

walk, bend, stand, stoop, sit, turn, climb, push, pull, speak, perform activities of daily

living, and engage in fine or gross manipulation with either hand.  (R. 208.)  He had no

limitations on lifting other than his own ability.  (*Id.*)  Dr. Yingling also noted that Ison

was enrolled in Thresholds' "pysch rehab."  (*Id.*)  He assessed Hepatitis C and Bipolar

disorder, but noted that any observations or results regarding Ison's mental impairments

"need[ed] to come from [a] psychiatrist."  (R. 205, 208.)

In May of 2009, claimant sought voluntary mental health and substance abuse

treatment from Trilogy Behavioral Healthcare.  (R. 266-279.)  On admission, his GAF

was documented as 37.  (R. 266.)  Among other things, claimant complained of racing

thoughts and mood swings, and addressed the difficulties he faces trying to stay sober

as a result of emotional distress and a low tolerance for conflict.  (R. 268, 270.)  At one

point during the interview, Ison left abruptly due to increased irritability and frustration

about the interviewer's questions.  (R. 278.)  The Trilogy evaluators diagnosed Bipolar II

disorder, Narcissistic Personality disorder, alcohol abuse, and cannabis abuse.  (R.

266.)[3]

### 3.    State Agency Consultants

On March 13, 2008, Dr. Erika Altman completed a "Psychiatric Review Technique" and a "Mental Residual Functional Capacity Assessment."  (R. 213-230.) She determined that Ison suffered from Bipolar disorder with episodes of both manic and depressive symptoms, as well as substance addiction with behavioral changes associated with the regular use of substances.  (R. 216, 221.)  Dr. Altman determined that Ison had mild limitations in activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (R. 223.)  More specifically, Dr. Altman found that Ison was moderately limited in his ability to maintain attention and concentration, and in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (R. 227.)  Dr. Altman did conclude that Ison could "understand, carryout, and remember simple instructions, make simple work related decisions, respond appropriately to others, and deal with routine work settings."  (R. 229.)

### C.    Claimant's Testimony

### 1.    Hearing Testimony

At the time of the hearing, Ison was 42 years old, single, and had no children. (R. 13.)  He dropped out of high school during his sophomore year, but later obtained

---

[3] The records from Trilogy were submitted to the Appeals Council after the ALJ rendered her decision.  (*See* R. at 4.)  As such, and as the Commissioner correctly notes, we may not consider this evidence.  *See Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004)

his GED in prison. (*Id.*) Claimant testified to having a few criminal convictions involving drug offenses and burglary. (R. 16-19.)

Between 1995 and 1998, Ison worked on and off as a telemarketer. (R. 28.) From 1997 through 2001, he worked as a stock person at a bar. (R. 27.) He also worked at a fast food restaurant in 1995, and as a laborer in 1999. (R. 28.) Ison has not worked since his job at a pet supply store, where he worked briefly from December of 2000 to January of 2001. (R. 27.)

Ison testified that he was homeless and spent the night prior to the hearing at a friend's house. (R. 14.) During the month prior to the hearing, he stayed in a "sleeping room" that Thresholds located for him. (*Id.*) He left after having trouble with another tenant and because he was surrounded by people who were "drinking and drugging." (R. 14-15, 20.) Ison also took issue with the lack of a phone in his room because he tries to call people when he feels like drinking or using drugs. (R. 20.)

For his substance abuse problems, in addition to attending Alcoholic Anonymous meetings, Ison testified that he receives treatment at C4. (R. 20.) He explained that he is supposed to go to C4 three times a week for therapy, and once a week for individual sessions, but that he does not always make it. (R. 20-21.) Ison last used drugs, specifically marijuana, eight days prior to the hearing. (R. 19.)

When asked by the ALJ which of his impairments bothers him the most, he responded that his Hepatitis is the most troublesome. (R. 21.) According to Ison, his Hepatitis causes him to feel weak and dizzy, and he often has trouble getting up in the morning. (R. 22.) Ison testified that he had not seen a doctor for his Heptatitis for approximately three years. (*Id.*) At that time, his doctor recommended that Ison not

take any medication unless he was very ill because of the side effects. (*Id.*) Ison felt

that his Heptatitis symptoms had gotten "a tad" worse, perhaps "only because of drug

and alcohol use." (R. 22-23.) However, he did testify that he experiences similar

symptoms when he is sober. (R. 23.)

Claimant also testified that he suffered from mood swings due to Bipolar

disorder. (R. 24.) When he is angry, or "blows a fuse" as he describes it, he swears

and screams, but does not destroy property or become physically violent. (*Id.*) During

his down phases, he feels very depressed and wants to give up on everything. (R. 25.)

He often tries to sleep off these feelings or, at times, he has turned to drugs and alcohol

to self-medicate. (*Id.*) His emotional problems have gotten worse over the past few

years. (R. 30.)

As for his left leg injury, Ison explained that he sustained the injury approximately

15 years ago during his tenure as a stock person at a bar. (R. 26-27.) He said that he

somehow pulled the muscles in his leg and they never healed properly. (R. 27.) He

also complained that "fallen arches" caused his feet to hurt. (R. 31.)

When asked about his interactions with other people, Ison testified that he had a

lot of verbal disagreements with his senior co-worker at the pet supply store and keeps

to himself at AA meetings. (R. 29-30.) He does not have any social friends that he

"should" spend time with and has no family that supports him emotionally. (R. 29.) For

fun, he likes to draw and play the guitar. (*Id.*)

Ison testified that he can lift up to thirty pounds and stand for up to four hours at a

time. (R. 31-32.) He has no problem sitting for extended periods of time, but claimed

that he would have a hard time working in a factory setting for more than a couple of

hours due to his lack of energy, and feelings of agitation and pressure. (R. 31-32.) Ison did express a desire to find part-time employment and maintain a sober and stable lifestyle. (R. 33.) He also testified that he has no medical coverage or income. (R. 32.)

No vocational expert or medical expert testified at the hearing.

### 2. Activities of Daily Living Questionnaire

Ison completed a questionnaire regarding his activities of daily living on February 16, 2008. (R. 152-161.) On a daily basis, Ison stated that he usually goes to AA or NA meetings, therapy sessions, or church, but he described himself as a "loner." (R. 152, 157.) Ison cooks for himself and has no problem taking care of his personal needs. (R. 153-154.) Once a week he does laundry and irons. (R. 154.) As for hobbies, Ison enjoys drawing, listening to music and playing the guitar. (R. 156.)

Ison claimed he could lift thirty pounds and walk five blocks before needing to take a break. (R.157.) Among other things, he indicated that his health problems affect his memory, concentration, and his ability to get along with others. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d, 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider

the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Id.*

While the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to his conclusion."  *Dixon v. Massanari*, 270 F.3d 1771, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate [his] assessment of the evidence to 'assure us that the ALJ considered the important evidence … [and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B.    Analysis under the Social Security Act

Whether a claimant qualifies to receive SSI depends on whether the claimant is "disabled" under the Social Security Act.  A person is disabled under the Act "if he or she has an inability to engage in any substantial gainful activity by reason of medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that

10

the Commissioner considers conclusively disabling, (4) if the claimant does not have a

conclusively disabling impairment, whether he can perform his past relevant work, and

(5) whether the claimant is capable of performing any work in the national economy."

*Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at

steps one through four. *Zurawaski v. Halter*, 245 F.3d at 885-86 (7th Cir. 2001). If the

claimant reaches step five, the burden shifts to the Commissioner to show that the

claimant is capable of performing work in the national economy. *Id*. at 886.

ALJ Halperin applied this five step analysis. At step one, the ALJ found that

claimant had not engaged in substantial gainful activity since December 19, 2007, his

application date. (R. 42.) At step two, the ALJ determined that Ison had the following

severe impairments: Hepatitis C, remote leg injury, Bipolar disorder, and substance

abuse. (*Id.*) At step three, the ALJ found that claimant "does not have an impairment or

combination of impairments that meets or medically equals one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*)

Next, the ALJ assessed Ison's residual functional capacity ("RFC") and

concluded that Ison has the RFC to perform light work as defined in 20 CFR §

416.967(b).[4] (R. 44.) Specifically, ALJ Halperin found that, based on his own

testimony, Ison can lift up to thirty pounds, stand or walk for four hours at one time, and

retains the capacity to sit consistent with the definition of light work. (*Id.*) She further

_____

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 CFR § 416.967(b).

limited Ison to "simple, unskilled work." (*Id.*)  Because claimant had no past relevant work the ALJ moved to step five and found that Ison was capable of performing jobs that exist in significant numbers in the national economy.  (R. 47.)  As such, the ALJ concluded that Ison had not been disabled as defined by the Act since December 19, 2007, the date the application was filed.  (*Id.*)    Claimant now argues that the ALJ (1) failed to adequately account for Ison's moderate limitations of concentration, persistence and pace in the RFC analysis; (2) improperly assessed Ison's credibility; and (3) erred by failing to call a vocational expert.  We address these arguments in turn below.

### C.    The ALJ's RFC Assessment was Deficient.

Ison first argues that the ALJ failed to account for Ison's moderate limitations of concentration, persistence and pace when she determined Ison's RFC.  We agree.

The RFC is "that which a claimant can still do despite [his] physical and mental limitations." *Clifford*, 227 F.3d at 873 n.7.  The ALJ's RFC conclusion must be supported by substantial evidence in the record.  *Id.* at 873.  Again, meaningful review requires the court to be able to trace the ALJ's path of reasoning.  *Id.*

Here, during her Step 3 analysis, ALJ Halperin acknowledged that Ison had moderate difficulties with regard to concentration, persistence and pace and she noted that memory and concentration problems were reflected in the medical records.  Later, when assessing Ison's RFC, she specifically cited to records from C4 indicating that his attention and memory problems limited his ability to read for a long time and that he writes notes to himself to supplement his memory.  (R. 246.)  Then, relying heavily on Dr. Altman's RFC determination, but without an explanation as to if or how she took

12

Ison's memory and attention problems into account, the ALJ limited Ison to simple, unskilled work. Absent such an explanation, we find it impossible to follow the rationale behind this limitation.

The Seventh Circuit has held on a number of occasions that employing terms such as "simple, repetitive tasks" does not necessarily account for limitations in concentration, persistence or pace. *See O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (collecting cases). This is because "the ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id.*; *see also* SSR 85-15, 1985 WL 56857 (1985) ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.").

Contrary to the Commissioner's assertion, we see no reason why the Seventh Circuit authority set forth in *O'Conner-Spinner* should not apply here. First, this is not a case where the ALJ's phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. *See, e.g, Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002) (finding inquiry into low-stress, uncomplicated work accounted for limitations arising partly from panic disorder). Further, although *O'Conner-Spinner* is most often relied upon to find error in an ALJ's hypothetical to a vocational expert, its rationale can be similarly applied to the ALJ's actual RFC assessment. In fact, in a recent unpublished opinion, the Seventh Circuit even recognized the propriety of such an application. *See Walters v. Astrue*, 444 Fed. Appx.

13

913, 918 n.1 (7th Cir. 2011) (noting that the claimant was not "claiming independent

error concerning the hypothetical question," but that he was "simply - and correctly -

citing *O'Connor–Spinner"* to attack the ALJ's RFC assessment).

Most importantly, the ALJ's RFC assessment must be minimally articulated to

build an accurate and logical bridge from the evidence to the conclusion. *Dixon*, 270

F.3d at 1176. Because the ALJ did not build that requisite bridge here, we are unable to

determine whether she accounted for Ison's memory and attention problems. As such,

remand is required.[5]

### D.     The ALJ Erred in Evaluating Ison's Credibility.

Next, for a number of reasons, Ison takes issue with the ALJ's credibility

assessment. Because the ALJ is in a superior position to judge the credibility of a

claimant, the ALJ's credibility finding will only be reversed if it is "patently wrong."

*Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan*, 912 F.2d

178, 181 (7th Cir.1990)). Indeed, the ALJ's credibility determination is entitled to

"special deference." *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (citing

*Powers*, 207 F.3d at 435). However, the ALJ is still required to articulate his reasoning

and discuss or distinguish relevant contrary evidence. *Clifford*, 227 F.3d at 870. "Thus,

although the ALJ need not discuss every piece of evidence in the record, the ALJ may

---

[5] Ison also argues that the ALJ failed to consider the checkmark in Dr. Altman's RFC assessment indicating that Ison was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 227.) In response, the Commissioner argues that the ALJ did not consider that checkmark because no authority requires an ALJ to include the checkmarks from the "summary conclusion" portion of the worksheet in the final RFC finding. That may be the case, but it is impossible to determine whether the ALJ disregarded the checkmark because she was permitted to do so or whether she simply overlooked that checkmark. As such, this issue should be addressed on remand.

not ignore an entire line of evidence that is contrary to the ruling.  Otherwise it is

impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial

evidence."  *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations

omitted).  Additionally, the ALJ must also follow the requirements of Social Security

Ruling ("SSR") 96-7p.  *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).  Among

other things, SSR 96-7p requires the ALJ to consider the entire case record when

evaluating an individual's credibility.  1996 WL 374186, at *4.

In our case, ALJ Halperin's credibility assessment began with the following

boilerplate language: "After careful consideration of the evidence, the undersigned finds

that the claimant's medically determinable impairments could reasonably be expected to

cause the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not credible to the

extent they are inconsistent with the above residual functional capacity assessment."

(R. 45.)  As the Seventh Circuit very recently reiterated, this boilerplate language "gets

things backwards."  *Bjornson v. Astrue*, --- F.3d ----, 2012 WL 280736, at *5 (7th Cir.

2012).  The Court explained: "the assessment of a claimant's ability to work will

often...depend heavily on the credibility of her statements concerning the 'intensity,

persistence and limiting effects' of her symptoms, but the passage implies that ability to

work is determined first and is then used to determine the claimant's credibility."  *Id.*

The Commissioner is certainly correct that use of boilerplate language is not

enough, by itself, to require remand.  Instead, what matters is the analysis that comes

along with that language.  *See, e.g, Richison v. Astrue*, No. 11–2274, 2012 WL 377674,

at *3  (7th Cir. Feb 7, 2012) (rejecting the boilerplate argument where the ALJ otherwise

provided a sufficient basis for his credibility assessment); *Carter v. Astrue*, 413 Fed. Appx. 899, 905-906 (7th Cir. 2011) (same). But here, as Ison points out, the few other reasons the ALJ provided for discrediting Ison's allegations are otherwise flawed.

First, relying on Ison's lack of treatment for Heptatis since he was in prison, ALJ Halperin determined that his Hepatitis "does not cause the claimant symptoms that are consistent with allegations of disability." (R. 45.) The ALJ also took issue with Ison's refusal of medication in July of 2008, stating that such a refusal suggests that his "mental problems are not as severe as alleged." (R. 46.) Both of these findings disregard well-settled authority that the ALJ must not draw any inferences about a claimant's condition from a lack of medical care unless the ALJ has explored the claimant's explanations as to the lack of medical care. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (citing SSR 96-7p). Further, an ALJ is permitted to use infrequent treatment or failure to follow a treatment plan as support for an adverse finding, but only where the claimant does not have a good reason for the failure or infrequency of treatment. *Id.*

Unfortunately, despite ample documentation of uncomfortable side effects from medication, as well as a lack of medical insurance, or any income, the ALJ failed to articulate why she disregarded Ison's possible explanations for not seeking treatment. We note that similar explanations have been found relevant to credibility determinations. *See, e.g., Craft,* 539 F.3d at 679 ("An inability to afford treatment is one reason that can provide insight into the individual's credibility."); *see also Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011). Perhaps even more disconcerting is that in the same paragraph that ALJ Halperin uses Ison's July 2008 refusal to take medication against

16

him, she actually acknowledges that a prior request not to take medication appeared to be a reasonable request. (R. 48.)

In further discrediting Ison's allegations, the ALJ cited to Ison's testimony that he would like to get a part-time job and maintain a stable lifestyle. (R. 46.) Ison argues that it was improper for the ALJ to consider Ison's desire to work. On the record before us, we agree.

Courts in this Circuit and others have acknowledged that a desire to work, by itself, should not be used as a negative credibility factor because a desire to work does not necessarily imply an ability to work. *Young v. Barnhart*, No. 02 C 305, 2003 WL 21918856, at *10 (N.D. Ind. May 5, 2003) (citing *Biri v. Apfel*, 4 F. Supp. 2d 1276, 1279 (D. Kan.1998)); *see also Stich v. Astrue*, No. 09 C 0483, 2010 WL 424607, at * 2 (E.D. Wis. Jan. 31, 2010) (citing *Jesse v. Barnhart*, 323 F. Supp. 2d 1100, 1106 (D. Kan. 2004)). When courts have upheld an ALJ's reliance on a claimant's desire to work to discredit his or her testimony, that desire has been paired with either actual work or an active search for work at a level higher than what the claimant alleged he or she could perform.[6] *See, e.g, Jesse*, 323 F. Supp. 2d at 1006 (finding that when claimant actually worked, the ALJ could consider this a factor in his determination of credibility); *see also Rockwell v. Astrue*, No. 11 C 29, 2012 WL 32643, at *5 (E.D. Wis. Jan. 6, 2012); *Young*, 2003 WL 21918856, at *10. Absent such similar circumstances here we find that it was improper for the ALJ to have relied on Ison's desire to work to discredit his testimony.

---

[6] We note that there are a few references in the record to Ison searching for a job. (R. 28, 254.) However, this issue was not fully explored at the hearing leaving the extent of that job search unclear.

We also agree with Ison that the ALJ did not sufficiently explore the relationship between Ison's drug use and his mental impairments. Without much of an explanation, the ALJ stated that "the claimant has a long history of drug use which exacerbates his symptoms from bipolar disorder." (R. 45.) As the Seventh Circuit has recognized, "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms." *Kangail v. Barnhart,* 454 F.3d 627, 629 (7th Cir. 2006). We find the ALJ's failure to acknowledge this fact warrants remand, especially where there is evidence in the record concerning Ison's tendency to self-medicate. (*See* R. 25.)[7]

Lastly, Ison argues that the ALJ's reliance on Ison's daily activities was improper. The ALJ only briefly commented on Ison's daily activities when she noted in the Step 3 analysis that Ison goes to therapy sessions and church, draws and plays the guitar, uses public transportation, goes shopping, and takes care of his personal needs without assistance. (R. 43.) According to Ison, the ALJ failed to address Ison's testimony as to how he performed those activities, *i.e.,* that he had a hard time getting up in the morning, making it to every therapy session, or keeping his cool at those sessions.

In response, the Commissioner correctly argues that the ALJ is permitted, and in fact required, to consider the claimant's daily activities when assessing a claimant's credibility. *See* SSR 96-7p. But, because remand is otherwise necessary here, we

---

[7] Later in her decision the ALJ did mention Dr. Wilson's note that Ison may not need medication if he could maintain sobriety. (R. 46.) But, to the extent that the Commissioner would argue that one can assume the ALJ relied on this statement to support her conclusion that Ison's drug use exacerbates his symptoms, we disagree. *See Golembiewski*, 322 F.3d at 916 ("[T]he cases make clear that the ALJ must specify the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony.").

advise the ALJ to carefully review the evidence regarding Ison's daily activities and to address how those activities do in fact support her conclusions.  *See Bjornson*, 2012 WL 280736, at *6 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons...and is not held to a minimum standard of performance, as she would be by an employer.  The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").  Further, we note that nobody ever asked Ison how long he usually played the guitar or drew in one sitting, thus leaving us without an explanation as to how those activities support a finding that he could maintain the concentration and focus necessary to work full time.

For all of these reasons, we find that the ALJ's credibility determination was deficient.  Of course, this is not to say that the ALJ's ultimate credibility finding was incorrect.  Instead, we find only that the basis for that finding, as set forth in the decision before us, was flawed and lacked sufficient support.

## E.     The ALJ's Decision Not to Call a Vocational Expert.

Given our findings above, we comment only briefly on the ALJ's decision not to call a vocational expert.  On remand, after re-examining Ison's RFC and credibility, the ALJ should again assess whether a vocational expert is required.  Of course, if the ALJ determines that Ison's non-exertional limitations substantially reduce the range of work Ison can perform, the ALJ should consult a vocational expert.  *See Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994).

## III.    CONCLUSION

19

For the reasons set forth above, claimant's motion for summary judgment is granted. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

ENTERED:

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:** **March 12, 2012**